IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

**MATTHEW J. BONETTE,**                   Case No. 3:16 CV 252

    Plaintiff,                              Judge Jeffrey J. Helmick

    v.                                      Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.                              REPORT AND RECOMMENDATION

## INTRODUCTION

Plaintiff, Matthew J. Bonette ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter has been referred to the undersigned pursuant to Local Rule 72.2. (Non-document entry dated February 2, 2016). For the reasons stated below, the undersigned recommends the Commissioner's decision be affirmed.

## PROCEDURAL BACKGROUND

Plaintiff filed for DIB and SSI in January 2013, alleging a disability onset date of May 9, 2012. (Tr. 161-74). The Commissioner, through the state agency, denied his applications at the initial level of review. (Tr. 79-108). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). *See* Tr. 121. Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on June 19, 2014. (Tr. 35-78). On September 29, 2014, the ALJ found Plaintiff not disabled in a written decision. (Tr. 13-29). The Appeals

Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-6); 20 C.F.R. §§ 404.955, 404.981. Plaintiff filed the instant action on February 2, 2016. (Doc. 1).

## FACTUAL BACKGROUND

### *Personal Background and Testimony*

Plaintiff was 50 years old at the time of the ALJ hearing and had a high school education and some college classes. (Tr. 44-45, 46). He had a driver's license, and drives short distances, but a friend had driven him to the hearing. (Tr. 44-45, 59). He did not have a handicapped permit for his car. (Tr. 59). The drive to the hearing was about an hour and his lower back "got quite sore". (Tr. 45).

Plaintiff lived alone. (Tr. 44). Volunteers of America paid, a friend covered his utilities, and he had medical coverage through the VA. (Tr. 45-46). He relied on food stamps, which he had been receiving since February 2014. (Tr. 46).

Plaintiff had previously worked as a paramedic, delivery driver, warehouse worker, and performed physicals on prospective plasma donors. (Tr. 47). As a delivery driver, he was on the road twelve hours per day five to six days per week. (Tr. 49). When he performed physicals, "[i]t was a lot of up and down work". (Tr. 50). During late 2011 or early 2012, the "getting up and down and walking to the donor floor got to be difficult." (Tr. 50-51). This was because he had "a lot of pain in the feet and legs" with "pins and needles, burning sometimes." (Tr. 51). Then in May 2012, Plaintiff began having an "increase in near falls and falls" and an increase in pain in his legs and lower back. (Tr. 52). His physician advised him to stop working. *Id.*

Plaintiff then began working again in September 2013 for a company that helps keep developmentally disabled people living independently. (Tr. 53). He worked a desk job remotely

monitoring people in their individual homes. (Tr. 53-54). Before November he was in training, but in November 2013 he began working 32 hours per week. (Tr. 55). He experienced a lot of anxiety working that job. *Id.*

Plaintiff testified the biggest issue preventing him from working is the pain in his legs and back. (Tr. 56). Plaintiff estimated he could sit for fifteen to twenty minutes comfortably before getting pain in his lower back that would travel to his hips. *Id.* Getting up and stretching helped for a few minutes. *Id.* Similarly, he estimated he could stand for ten to fifteen minutes at a time, and walk for about ten minutes. *Id.*

Plaintiff does his own grocery shopping, but makes short (less than fifteen minute) trips. (Tr. 57). He does household chores, but breaks them up into increments, sitting down to rest at times. (Tr. 58). He usually has to take a ten to fifteen minute break (sitting with his legs elevated) after ten to fifteen minutes of work. (Tr. 64-65). This is because his lower body (legs, back, and feet) get sore and his ankles swell. *Id.* He sits down to elevate his legs above waist level four to five times per day for 15 to 25 minutes at a time. (Tr. 65). It helps "some" with the pain and burning sensation he gets in his feet. (Tr. 65-66).

He is generally able to take care of personal grooming. (Tr. 60). He takes short showers, and has to sit down to get dressed so he does not fall. *Id.* He used to hike, hunt and fish, camp, make jewelry, and do wood carving. (Tr. 58). The only activity he can still do is the jewelry making, but "it's limited to how long I can actually work on a piece." *Id.*

Plaintiff does not sleep well at night, waking four to six times per night due to pain and disturbing dreams. (Tr. 68). He will "roll over, reposition, try to stretch out the area that's sore, and then try to get back to sleep." *Id.* He also naps every afternoon. *Id.*

3

Plaintiff uses a cane because he "had a number of near falls" and his right side is his weaker side. (Tr. 59). He uses the cane for support to take weight off his right leg. (Tr. 59-60). He testified that squatting aggravates his pain, kneeling is "next to impossible", and "[b]ending down to pick something up is pretty difficult". (Tr. 60).

Plaintiff estimated he can comfortably lift between ten and twenty pounds but "anything over 20 gets quite painful" in his knees and lower back. (Tr. 61). He has difficulty reaching for things over his head and drops things often because he "can't feel them in [his] hands." *Id.*

Plaintiff testified that during his 2012 treatment at the Sparrow Pain Center he had steroidal injections, which helped for a week to two weeks. (Tr. 67). The injection did not eliminate the pain, "but it would ease it enough so that [he] could function a little better." *Id.* He also had an ablation on the right side which only lasted a day or two. *Id.*

At the time of the hearing, Plaintiff was taking "Neurontin which is Gabapen," Effexor, Mobic, Prazosin, and aspirin. (Tr. 63).

***Relevant Medical Evidence***[1]

*Prior to Alleged Onset Date*

Beginning in January 2011, Plaintiff saw Shannon Wiggins, D.O., complaining of "chronic lower back pain and decreased mobility." (Tr. 378). Dr. Wiggins diagnosed disc disorder (not otherwise specified) and radiculitis (not otherwise specified). (Tr. 379). In early 2011, Dr. Wiggins also diagnosed joint pain (unspecified) (Tr. 372, 374), lumbago (Tr. 372, 374, 377), muscle spasms (Tr. 374), and arthralgia (Tr. 374).

---

1. Plaintiff only challenges the ALJ's decision as it relates to his physical impairments, specifically his neuropathy. As such, the undersigned only summarizes the relevant evidence in the transcript. *See Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003) (issues not raised in claimant's brief waived).

4

In March 2011, Plaintiff saw neurologist Jayne Ward, D.O., for "paresthesias, gait difficulties and possible MS." (Tr. 322). She noted these problems had begun March 2010, and that Plaintiff started using a cane in December 2010. *Id.* Dr. Ward noted a decreased Achilles reflex bilaterally, 5/5 strength proximally and distally in all 4 limbs, no atrophy or fasciculations, and an antalgic gate with cane. (Tr. 324). Dr. Ward's impression was paresthesias "with some suggestion of peripheral neuropathy on exam", fatigue, and diffuse pain. (Tr. 325).

In April 2011, Plaintiff underwent a cervical spine MRI and brain MRI. (Tr. 253, 255). The cervical spine MRI showed "left-sided disc extrusion perhaps in conjunction with spurring at the C2-C3 level causing asymmetric narrowing of the left foramen and lateral recess but no frank cord compression" and "spondylotic changes demonstrated throughout the cervical spine with associated facet arthropathy causing narrowing of foramina at multiple levels." (Tr. 254). The brain MRI showed an "atypical area of periventricular signal involving the right lateral ventricle anteriorly." (Tr. 255).

In June 2011, Plaintiff underwent an electrodiagnostic evaluation with M. Andary, M.D. (Tr. 257). Dr. Andary noted Plaintiff complained of "progressively worsening paresthesias in the fingertips and in the toes", "generalized achy pain as well as weakness in the legs" and "progressively worsening unsteady gait." *Id.* Dr. Andary noted motor strength of "4+ to 5/5" with "giveway weakness". *Id.* He noted muscle stretch reflexes were absent in the bilateral patellar tendons, and bilateral calf tenderness to palpation. *Id.* Dr. Andary also noted no muscle atrophy and negative bilateral straight leg raising. *Id.* Dr. Andary noted Plaintiff's symptoms were "difficult to pull together under one diagnosis" but were most consistent with "a non length dependent, primarily axonal, primarily motor, polyradiculoneuropathy." (Tr. 258).

Plaintiff saw Dr. Ward again in the second half of 2011 and reported numbness in his hands and feet as well as joint and muscle pain. (Tr. 317-20, 312-15). Dr. Ward noted decreased strength of 4/5 in leg muscles, but no atrophy or fasciculations, and physiologic tone in upper and lower extremities. (Tr. 319). She also noted unsteady heel, toe, and tandem walking. (Tr. 314, 319). Dr. Ward also observed a decreased Achilles reflex bilaterally and decreased sensation in a distal to proximal pattern to pin prick, temperature, and vibration. *Id.* Dr. Ward's impression remained neuropathy, fatigue and diffuse pain. (Tr. 315, 319).

Plaintiff also continued to see Dr. Wiggins, who diagnosed neuropathy and prescribed medication. (Tr. 360-64).

Plaintiff had a repeat electrodiagnostic evaluation with Dr. Andary in December 2011. He noted Plaintiff reported more fatigue, but his weakness and function were about the same, and he had stopped walking with a cane. (Tr. 302). He again noted mild giveway weakness in the quadriceps, anterior tibiols and extension hallucis longus. *Id.* Dr. Andary again noted "diffuse electrodiagnostic abnormalities that appear to be most consistent with a non length dependent, primarily axonal, primarily motor polyradiculoneuropathy." *Id.* He noted that "[i]it is possible it is slowly improving" but that he was "not able to absolutely prove that." *Id.*

Plaintiff again saw Dr. Ward in January 2012. (Tr. 307). He reported worsening gait, a burning sensation in his hands, and leg weakness after standing or sitting too long. *Id.* Dr. Ward noted similar physical findings as in previous visits, and continued to assess neuropathy, fatigue, and diffuse pain. (Tr. 309-10).

Plaintiff underwent a neuromuscular evaluation in January 2012 with Richard Lewis, M.D. (Tr. 327-29). Plaintiff reported a waddling gait for the past two to three years, tingling in his hands, numbness in his feet, as well as joint and muscle pains. (Tr. 327). A physical

examination revealed no tenderness in his joints, absent reflexes in his legs, "markedly absent vibration in the toes, decreased at the ankles", decreased pin sensation at his ankles, and a tentative gait that was "slightly wide-based." (Tr. 328). Dr. Lewis concluded Plaintiff "does not have evidence of neuropathy. . . . The EMG findings of diffuse limb and paraspinal fibrillations are difficult to interpret but the studies do not clearly suggest an axonal neuropathy. Given the family history this may well represent an inherited disorder but it may not be a neuropathy." *Id.*

*After the Alleged Onset Date*

Plaintiff continued to treat with Dr. Wiggins in 2012. She noted decreased sensation in Plaintiff's feet (Tr. 356, 358), complaints of burning pain (Tr. 354, 355, 358), and numbness (Tr. 356). In May, Dr. Wiggins noted it was difficult for Plaintiff to work as he could not stand for long hours and that she would "give him off work for one month pending referral to pain [service]." (Tr. 358). In June, she noted "[N]eurontin is working well overall" but that Plaintiff was unable to see pain service right away so she would "extend his loa [leave of absence] for another 30 days." *Id.* He returned in July after having seen pain services. (Tr. 355). Dr. Wiggins noted Plaintiff had "severe peripheral neuropathy, etiology unknown" with "chronic lower limb pain, burning, and numbness", but that she would refill his medications as Plaintiff stated they "assist him with the activities of daily life." *Id.* She repeated that "the medications help him with the activities of daily life" in September 2012. (Tr. 354).

In June 2012, Plaintiff underwent a consultation with Marc Silverstein, M.D., at Sparrow Pain Management Center. (Tr. 342-43). Plaintiff reported progressively worsening pain and a diagnosis of idiopathic neuropathy. (Tr. 342). He described constant pain in his lower back, upper extremities, and lower extremities that increased with activity, and decreased with rest, not working, cold, [and] medications." *Id.* On examination, Dr. Silverstein found: 1)

7

increased pain in the lumbar spine with hyperextension, flexion, and rotation; 2) tenderness to palpation in the thoracolumbar spine axially and bilaterally; 3) reduced deep tendon reflexes and sensation of the bilateral upper and lower extremities; 4) generalized weakness and deconditioning in the bilateral upper and lower extremities; 5) altered gait due to use of a cane; and 6) negative straight leg raises and Spurling sign. (Tr. 343). Dr. Silverstein assessed cervicalgia, low back pain, disc degeneration, radiculopathy, spondylosis, and neuropathy. *Id.* He scheduled Plaintiff for joint injections. *Id.*

Plaintiff underwent lumbar injections from June 2012 through September 2012. (Tr. 330-41). Before the first injections (bilateral lumbar facet joint injections from L3-4 to L5-S1), Plaintiff described pain of 8/10 and had tenderness to palpation in his axial low back and pain with facet loading bilaterally. (Tr. 340). The following month, Plaintiff described pain in the lower back with radiation into both buttocks with pain 7-8/10. (Tr. 338). Plaintiff underwent lumbar transforaminal epidural steroid injections at L4-5 and L5-S1. *Id.* In August 2012, Plaintiff reported nerve block therapy "so far has not given him significant relief." (Tr. 336). He underwent bilateral sacral transforaminal epidural steroid injections at S1, S2, and S3. *Id.* Later that month, Plaintiff reported the bilateral lumbar facet joint injections had provided 70% to 80% "of good pain relief for 2-3 days" but other interventions had not provided benefit. (Tr. 334). He underwent an interlaminal lumbar epidural steroid injection. (Tr. 334-35). At his next visit in September 2012, Plaintiff reported he had significant relief of his pain for three to four days following the dorsal sacral nerve block. (Tr. 332). Examination indicated similar findings to those in June 2012, but gait was "steady and symmetrical." *Id.* Later in September 2012, the pain management physician reported Plaintiff had eight to ten days of "dramatic improvement when peripheral nerve blocks were carried out in" August of that year. (Tr. 330). Plaintiff then

underwent a right-sided peripheral nerve neurolysis because of "his failure to respond to conservative management". (Tr. 330-31). There are no additional records from Sparrow Pain Management.

In October 2012, Plaintiff saw James Eichmeier, M.D., in the same office as Dr. Wiggins. (Tr. 353). He noted "idiopathic polyneuropathy" and nerve conduction studies scheduled for the following day. *Id.* Dr. Eichmeier noted that "if that verifies chronic diffuse polyneuropathy", Dr. Eichmeier would "fill out his papers." *Id.* The nerve conduction study was performed the following day. (Tr. 345-50). The results were normal with "no electrophysiologic evidence for either a mono or peripheral polyneuropathy". (Tr. 347).

In November 2012, Plaintiff saw a provider at Dr. Wiggins's office.[2] The treatment note references Plaintiff's nerve conduction study, but notes it "is not on the chart yet." (Tr. 352). Plaintiff brought "papers for permanent disability", but the provider "told him [he or she] did not known him well and not well. [sic] Objective data and [the provider] suggested he return to see Dr. Wiggins at which time hopefully we will be able to[] get [his] nerve conduction study on the computer" but that at the present time, the provider could not "totally disable him." *Id.*

In January 2013, Plaintiff reported a worsening of his polyneuropathy to Dr. Wiggins. (Tr. 351). Dr. Wiggins reported decreased sensation in bilateral feet, right greater than left, and that Plaintiff walked with a cane. *Id.* She noted completing "friend of the court papers for disability" and "an exam form for dhs." *Id.*

In January 2014, Plaintiff underwent another nerve conduction study of his legs and feet with Kalyani Shah, M.D. (Tr. 397-400). It showed a moderate degree of peripheral sensory

---

2. This treatment note indicates Dr. Wiggins as the provider, and bears her electronic signature, but the text of the note indicates it was written by a different provider. *See* Tr. 352 (noting Plaintiff should "return to see Dr. Wiggins" and stating that medications were reviewed by Dr. Eichmeier).

polyneuropathy in the lower extremities, which was demyelinating in nature. (Tr. 400). It showed no evidence of peroneal entrapment neuropathy at fibular head bilaterally and no evidence of bilateral lumbar radiculopathy. *Id.*

*Opinion Evidence*

In April 2013, state agency reviewing physician Russell Holmes, M.D., opined that Plaintiff could: 1) occasionally lift and/or carry 20 pounds; 2) frequently lift and/or carry 10 pounds; 3) stand and/or walk for four hours in an eight-hour workday; 4) sit about six hours in an eight-hour workday; 5) limited push/pull in lower extremities—frequent bilateral foot pedal; 6) frequently climb ramps and stairs, balance, kneel, or crawl; 7) occasionally climb ladders, ropes and scaffolds; and 8) occasionally stoop, or crouch. (Tr. 88). He also believed Plaintiff should avoid concentrated exposure to extreme cold or heat, vibration, fumes, odors, dust, gasses, and hazards. (Tr. 88-89). In response to a question regarding the "seven strength factors of the physical RFC (lifting/carrying, standing, walking, sitting, pushing, and pulling), the individual demonstrates the maximum sustained work capacity for the following", the agency answered "SEDENTARY." (Tr. 92). Earlier, in the "findings of fact and analysis of evidence" section, the agency physician noted: "RFC for sedentary work (light with significantly limited walking). Clmt uses cane to ambulate. Gait changes, noted to be unsteady." (Tr. 85).

After the ALJ hearing, in July 2014, Plaintiff underwent a consultative examination with neurologist Dariush Saghafi, M.D. (Tr. 421-23). Plaintiff reported to Dr. Saghafi that his pain was localized in his lower back, and had gotten worse over the past six years. (Tr. 421). He reported that getting off his feet improves the pain, while bending and reaching makes it worse. *Id.* He reported medication "doesn't really help" and that lifting ten pounds is "quite painful." *Id.* On examination Dr. Saghafi found a 70 to 80% reduction in tactile sensation below mid-calf,

worse on the left side. (Tr. 423). He noted an "antalgic gait without predisposition to falls." *Id.*

Dr. Saghafi observed Plaintiff's "[t]one and bulk are normal for age and build in both upper and

lower extremities" with "no signs of focal atrophy, fasciculations, or myotonia" and "no orbiting

or pronator drift." (Tr. 422). He found full motor strength in both upper and lower extremities.

*Id.*; *see also* Tr. 431. Dr. Saghafi's impression was that Plaintiff "demonstrate[s] elements of a

sensory neuropathy in the lower extremities." (Tr. 423). He noted Plaintiff "is able to lift, push,

and pull sufficiently to be able to perform some ADL's but is restricted to 10 lbs of lifting. The

patient is able to bend, walk, and stand x 15-20 min." *Id.*

The same day, Dr. Saghafi completed a physical capacity evaluation form. (Tr. 424-29).

He indicated Plaintiff could continuously lift up to 10 pounds, occasionally lift up 11 to 20

pounds, and occasionally carry 11 to 20 pounds. (Tr. 424). He opined Plaintiff could: 1) sit,

stand, or walk for fifteen minutes at a time without interruption; 2) sit for four hours total in an

eight-hour workday; 3) stand or walk for two hours total each in an eight-hour workday. (Tr.

425). He stated Plaintiff needed a cane to ambulate, but could walk 100 yards without the use of

the cane. *Id.* He indicated that Plaintiff could use his free hand to carry small objects with the

cane. *Id.*[3] He found Plaintiff had no restrictions in the use of his hands and could frequently

operate foot controls with both feet. (Tr. 426). Plaintiff could never climb ladders or scaffolds,

but could frequently climb stairs and ramps, balance, stoop, kneel, crouch, or crawl. (Tr. 427).

He also found Plaintiff should never be exposed to unprotected heights or very loud noises. (Tr.

---

3. The form question states: "Without a cane, can the individual use his/her free hand to carry small objects?" (Tr. 425). This appears to be a typographical error, and should read "with" rather than "without" a cane (otherwise the individual would not have only one "free hand"). This understanding appears to be confirmed by the notation Dr. Saghafi made at the bottom of the page: "[c]ane is used for carrying small objects at a time." *Id.*

428). He opined that the restrictions above were first present "4-5 years ago" and that the limitations have lasted (or will last) for twelve consecutive months. (Tr. 429).

### VE Testimony and ALJ Decision

#### VE Testimony

For the first hypothetical, the ALJ asked the VE to assume:

> An individual who can lift 20 pounds occasionally, 10 pounds frequently; who can stand and walk for a total of four hours in a day; and sit for six hours in the day. The individual can frequently push and pull with bilateral lower extremities; can frequently climb stairs and ramps; occasionally climb ladders, ropes, and scaffolds; can frequently balance but due to weakness in the legs also requires the use of a cane for balance.

> The individual can frequently stoop; occasionally kneel; frequently crouch; and there's no restriction on crawling. The individual must avoid concentrated exposure to extreme temperatures; avoid concentrated exposure to respiratory irritants; and avoid concentrated exposure to vibration and to hazards such as dangerous moving machinery and unprotected heights.

(Tr. 73-74). The VE testified that such an individual could perform jobs including assembler, package, and inspector. (Tr. 74).

The ALJ then added a restriction that "the individual . . . should be allowed to perform work at a seated or standing position." (Tr. 75). The VE testified that the same jobs would be available, but reduced by 50 percent. (Tr. 76).

When a restriction was added that the individual could work for 10 to 15 minutes and then take a break for 10 to 15 minutes, the VE testified that it would eliminate all competitive employment. (Tr. 76). The same was true when a restriction requiring elevating the legs four to five times per day for 10 to 25 minutes. *Id*. Finally, the VE testified that the normal tolerance for absenteeism is one day per month. *Id.*

*ALJ Decision*

After reviewing the record, the ALJ concluded Plaintiff: 1) met the insured status requirements of the Social Security Act through March 31, 2018; 2) had not engaged in substantial gainful activity since May 9, 2012 (his alleged onset date); 3) had severe impairments of degenerative disc disease of the lumbar spine, moderate bilateral idiopathic progressive neuropathy, major depressive disorder (in partial remission), and alcohol use disorder (in early remission); 4) and did not have an impairment or combination of impairments that meets or equals the severity of the listings. (Tr. 16-17). The ALJ then concluded Plaintiff retained the residual functional capacity to:

> [p]erform less than the full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b) in that he can lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk for 4 hours and sit for 6 hours out of an 8-hour workday. He can occasionally climb ladders, ropes, and scaffolds and frequently climb stairs and ramps and frequently use his bilateral lower extremities for pushing and pulling. He can frequently balance but must be able to use a cane for balance and requires the ability to alternate between sitting and standing. He can occasionally kneel and frequently crouch and stoop. He does not have any limitations relative to the ability to crawl. He must avoid concentrated exposures to temperature extremes, respiratory irritants, vibrations, and hazards such as unprotected heights and moving machinery. He is limited to work consistent with a SVP of two, which means work that can be learned within the timeframe of a short demonstration up to 30 days.

(Tr. 18). The ALJ noted Plaintiff was 48 years old, a younger individual, on the alleged disability onset date, and subsequently changed age category to closely approaching advanced age. (Tr. 28). She noted Plaintiff had at least a high school education, and concluded (relying on the testimony of the VE) considering Plaintiff's age, education, work experience, and RFC, there were jobs that exist in significant numbers in the national economy that Plaintiff can perform. (Tr. 28). Therefore, the ALJ found Plaintiff was not disabled from May 9, 2012 through the date of her decision. (Tr. 29).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1.  Was claimant engaged in a substantial gainful activity?

2.  Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which

14

substantially limits an individual's ability to perform basic work activities?

3.     Does the severe impairment meet one of the listed impairments?

4.     What is claimant's residual functional capacity and can claimant perform past relevant work?

5.     Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff raises two objections to the ALJ's decision: 1) the ALJ's RFC is not supported by substantial evidence; and 2) the ALJ erred in concluding Plaintiff could do light work while using a cane. The Commissioner responds that the RFC is supported by substantial evidence, and there is no error in finding Plaintiff could do light work while using a cane.

### *RFC Determination*

Plaintiff contends that the ALJ relied upon "5 basic premises" in formulating her RFC and all were in error. He alleges these were: 1) a lack of objective evidence; 2) Dr. Wiggins's refusal to complete disability paperwork; 3) reliance on Dr. Saghafi's report; 4) Plaintiff's activities of daily living; and 5) reliance on the state agency medical consultant, Dr. Holmes.

15

Plaintiff contends that "at best, he is capable of sedentary work activity". (Doc. 14, at 13) (footnote omitted). The Commissioner responds that the RFC is supported by substantial evidence. The undersigned addresses each of Plaintiff's arguments in turn below.

A claimant's RFC is defined as "the most [a claimant] can still do despite his limitations." 20 C.F.R. § 404.1545(a)(1); *Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 429 (6th Cir. 2007). In determining a claimant's RFC, the ALJ is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere." *See* 42 U.S.C. §§ 423(d)(2)(B), (5)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988). The responsibility for determining a claimant's RFC "rests with the ALJ, not a physician." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1546(c), 416.946(c)). The RFC describes "the claimant's residual abilities or what a claimant can do, not what maladies a claimant suffers from—though the maladies will certainly inform the ALJ's conclusion about the claimant's abilities." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 240 (6th Cir. 2002). Discretion is "vested in the ALJ to weigh all the evidence." *Bradley v. Sec'y of Health & Human Svcs.*, 862 F.2d 1224, 1227 (6th Cir. 1988); *see Long v. Comm'r of Soc. Sec.*, 56 F. App'x 213, 214 (6th Cir. 2003) ("Generally, our Court may not re-weigh the evidence and substitute its own judgment for that of the Commissioner even if it finds that the evidence preponderates against the Commissioner's decision.") (internal citation and quotation omitted).

### Objective Evidence

Plaintiff first objects to the ALJ's statement that a more restrictive RFC is not supported by the objective evidence. Specifically, Plaintiff challenges the ALJ's finding that Plaintiff could stand or walk for four hours in an eight-hour workday. Plaintiff summarizes the evidence in the

16

record and, in essence, asks this Court to re-weigh that evidence and conclude it does not support the ALJ's RFC because "the evidence demonstrates consistent notations of lower extremity sensory loss, weakness, reflex loss, and poor gait." (Doc. 14, at 17). The Commissioner responds that the ALJ adequately considered and accounted for Plaintiff's limitations.

The ALJ here thoroughly summarized the evidence of record, both medical and non-medical. *See* Tr. 17-27. The ALJ recognized Plaintiff's "consistent complaints and treatment showing [him] to have decreased sensation the bilateral plantar aspects of his feet and general gait and strength issues in his lower extremity". (Tr. 25). The ALJ also accepted Plaintiff's diagnosis of neuropathy in his legs, specifically mentioning the January 2014 finding of moderate peripheral sensory motor polyneuropathy. (Tr. 25) (citing Tr. 400). The ALJ accommodated limitations flowing therefrom in the RFC by limiting Plaintiff to four hours of standing and walking (a restriction supported by the opinions of Dr. Saghafi and Dr. Holmes), the use of a cane for balance, and the ability to alternate between sitting and standing.[4]

Substantial evidence in the record supports the ALJ's RFC. First, although the record reflects consistent findings of reduced sensation in the lower legs and feet as well as absent reflexes (Tr. 257, 302, 309, 314, 319, 328, 343, 356, 358, 397, 423),[5] it also reflects full—or near full—motor strength (Tr. 324, 340, 422, 431), no signs of muscle atrophy in the legs (Tr. 257,

---

4. As an aside, the undersigned notes that this limitation, requiring that any job permit Plaintiff to alternate between sitting and standing, would seemingly further limit the "walking" requirement of any job identified by the VE, and thus undermines Plaintiff's argument that the RFC does not adequately reflect his limitations.
5. To be sure, there are also notations of reduced motor strength. *See* Tr. 257 ("motor strength is 4+ to 5/5 (giveway weakness)"); Tr. 319 (noting 4/5 muscle strength in upper and lower extremities).

319, 324, 422, 431), a lack of myotonia (Tr. 422), and lack of fasciculations (Tr. 319, 324, 422), and normal tone (Tr. 319, 422). [6]

Second, as mentioned above, and discussed further below, the restriction to four hours of standing and walking in an eight-hour workday is supported by the only two pieces of opinion evidence in the record. Both Dr. Holmes (the state agency reviewing physician) and Dr. Saghafi (the state agency consultative physician) opined independently that despite Plaintiff's physical impairments, he could stand and walk for four hours in an eight-hour workday. *See* Tr. 88 (Dr. Holmes's opinion that Plaintiff could stand and/or walk for a total of four hours in an eight-hour workday); Tr. 425 (Dr. Saghafi's opinion that Plaintiff could stand and walk for two hours each in an eight-hour workday). There is no contradictory opinion evidence of record on this point.

Overall, the ALJ evaluated the objective evidence and accommodated it in the RFC. *See* Tr. 16. Although Plaintiff points to other evidence in the record, and a different reading of that evidence to support his conclusion that he is only capable of sedentary work, this Court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. The undersigned finds that it does, consistent with the analysis below.

---

6. Plaintiff, rightfully so, takes issue with the ALJ's reliance on the lack of "pronator drift" as a finding supporting the conclusion that Plaintiff can stand and walk more than he alleges. *See* Tr. 25. Pronator drift is a test performed on the upper extremities, and would not appear to have any bearing on the ability to stand and walk. *See Leib v. Colvin*, 2013 WL 1405953, *7 n.26 (M.D. Pa.) ("Pronator drift is indicative of upper motor neuron weakness. A patient is asked to close his or her eyes and extend the arms at shoulder level with the palms facing upward. If the patient cannot hold the position for 20 or 30 seconds and the palm(s) drift(s) downward the test is positive.") (internal citation omitted). Thus, the ALJ's reliance on this was error. However, "judicial review does not contemplate a quest for administrative perfection", *Brownfield v. Astrue*, 2010 WL 5557443, * (W.D. Ky.), but rather this Court examines whether the ALJ's decision is supported by substantial evidence. Were this "lack of pronator drift" the only reasoning the ALJ gave for her decision, the decision would not be supported by substantial evidence, but it was not the only reason.

*Dr. Wiggins's Refusal to Complete Disability Paperwork*

Second, Plaintiff contends it was error for the ALJ to rely on a physician's refusal to complete disability paperwork. In her decision, the ALJ stated:

> The claimant then saw Dr. Wiggins on November 6, 2012, and requested that she complete paperwork showing permanent disability, but she declined to complete [it]. The doctor then saw the claimant on January 16, 2013, where the record noted that he completed "friend of the court" papers for disability (child support) and a form for the department of human services. . . I find that the statement contained in the November 2012 medical record entry is consistent with the finding that the claimant does not have impairments that would preclude all work activity and note that the records Dr. Wiggins completed for child support and human services are not contained in the record and consequently can be afforded no weight.

(Tr. 22) (citation omitted). Preliminarily, Plaintiff is correct that the ALJ misidentified the provider in the November 6 record. Although the record lists Dr. Wiggins as the provider and states she reviewed and electronically signed the record, it also states: "I suggested he return to see Dr. Wiggins", indicating it was completed by a different provider. (Tr. 352). Nonetheless, the treating provider did decline to complete disability paperwork, stating "I told him I do not know him well . . . and I suggested he return to see Dr. Wiggins at which time hopefully we will be able to [] get [his] nerve condition study on the computer but I told him at this time[] I cannot totally disable him." *Id.* Thus, although the ALJ misidentified the provider, the ALJ accurately noted that the provider declined to complete the disability paperwork. Moreover, part of the reason for the provider's refusal to complete the paperwork was seemingly that the nerve conduction study results were not available on the computer. *See* Tr. 352. Notably, the nerve conduction study results (regarding Plaintiff's arms and hands) were normal. *See* Tr. 345-50.[7]

---

7. Moreover, as the Commissioner points out, on October 3, 2012, Dr. Eichmeier noted "[w]e will have the nerve conduction studies scheduled here for tomorrow and if that verifies chronic diffuse polyneuropathy I told him I can then fill out his papers." (Tr. 353). Again, the nerve

Because, as discussed herein, the ALJ's RFC analysis is supported by substantial evidence, any error in misidentifying the provider this regard is harmless.

Plaintiff also argues the ALJ should have given weight to the January 2013 notation that Dr. Wiggins completed "friend of the court papers for disability" and "also filled out an exam form for dhs". (Tr. 351). The ALJ explained explicitly that she could not afford weight to something not in the record, and the paperwork referenced is not part of the record. (Tr. 22). This is not error.

### Dr. Saghafi's Report

Third, Plaintiff contends the ALJ erred in giving "partial weight" to consultative examiner Dr. Saghafi's report, because that report is: 1) internally inconsistent, 2) not supported by his own examination findings, and 3) not supported by the record as a whole. The Commissioner responds that a lone inconsistency in Dr. Saghafi's report does not undermine the entire report.

Specifically, Plaintiff points to the fact that Dr. Saghafi opined in his narrative conclusion that Plaintiff was limited to lifting ten pounds (Tr. 423), but in his medical source statement, indicated Plaintiff could lift up to twenty pounds occasionally (Tr. 424). In his decision to give Dr. Saghafi's opinion partial weight, the ALJ summarized the opinion (including its restriction to ten pounds of lifting) (Tr. 22-23), and then explained:

> Partial weight is afforded to the doctor's opinions that in the record, as discussed in greater detail below, supports the claimant's ability to perform a reduced range of light work activity with the need to use a cane for balancing and the ability to alternate between sitting and standing. That said, the record supports the determination that the claimant can sit for 6 hours and can stand or walk for 4 hours and the postural limitations set forth in his assigned residual functional capacity given the limited treatment relative to his back and findings that

conduction studies performed October 4, 2012 were normal, and there is no record of Dr. Eichmeier completing any disability paperwork for Plaintiff.

> generally show him to have negative straight leg raising or significant findings relating to his spine. The neuropathy that involves his feet to mid-calf further supports his ability to perform tasks consistent with his residual functional capacity and the claimant acknowledged in his hearing testimony the ability to lift up to 20 pounds. I note that the doctor's opinions do support the ability to perform work tasks and are not consistent with a level that would establish disabling limitations.

(Tr. 23). The ALJ's reasoning is supported by substantial evidence. An ALJ is to consider numerous factors in constructing a claimant's RFC, including the medical evidence, non-medical evidence, and the claimant's credibility. *See* SSR 96-5p, 1996 WL 374183, at *3; SSR 96-8p, 1996 WL 374184, at *5; *Hickey-Haynes v. Barnhart*, 116 F. App'x 718, 726-27 (6th Cir. 2004). Here, the ALJ noted both of Dr. Saghafi's (conflicting) restrictions on lifting, and emphasized Plaintiff's own testimony that he could lift up to 20 pounds. *See* Tr. 61 (Plaintiff's response to a question about the "heaviest that [he] feel[s] comfortable lifting" was: "[b]etween 10 and 20 pounds, anything over 20 gets painful"). Thus, the ALJ reasonably resolved this internal inconsistency with the record as a whole.

Plaintiff secondly contends that Dr. Saghafi's opinion is not supported by his own findings because he opined use of a cane was medically necessary, found reduced tactile sensation below mid-calf, and noted an antalgic gait. Plaintiff contends these findings are inconsistent with Dr. Saghafi's finding that Plaintiff could stand and walk, combined, for four hours in an eight-hour workday. State agency physicians are "highly qualified physicians and psychologists who are also experts in Social Security disability evaluation." 20 C.F.R. § 404.1527(e)(2)(i). The ALJ, additionally, accounted for Dr. Saghafi's opinion that a cane was necessary (adopting it in her RFC). Moreover, the ALJ noted that "the doctor's opinions do support the ability to perform work tasks and are not consistent with a level that would establish disabling limitations." (Tr. 23). In addition to his opinion that Plaintiff could stand and walk for

two hours each in an eight-hour workday, Dr. Saghafi noted Plaintiff could sit, stand, or walk for fifteen minutes at a time without interruption. The ALJ accommodated this limitation at least to some degree by requiring jobs that could be performed in a seated or standing position. (Tr. 18). Notably, Dr. Holmes, the state agency reviewing physician, reached a similar conclusion regarding Plaintiff's ability to walk. Thus, the ALJ did not err in relying in part on Dr. Saghafi's opinion and the undersigned finds substantial evidence supports the ALJ's consideration thereof.

*Activities of Daily Living*

Fourth, Plaintiff contends the ALJ erred in his evaluation of Plaintiff's activities of daily living. Plaintiff summarizes his self-reports and testimony about his daily activities and contends that "in the context of the whole record, [these activities] are consistent with a regulation to sedentary (or less) work, contrary to the ALJ's assertion otherwise." (Doc. 14, at 21). Plaintiff argues that "[t]he ALJ relies in part on an assertion that Plaintiff's activities of daily living are not consistent with a more restrictive RFC." *Id.* at 20 (citing Tr. 26). The Commissioner asserts that the ALJ did not equate Plaintiff's ability to perform daily activities with the capacity to sustain work activity and thus there was no error.

On this page of the transcript, the ALJ explained, after summarizing the medical evidence: "The record also shows that the claimant can care for his personal hygiene, does not use a chair in the shower, can prepare simple meals, perform household chores, shop, and interact with his friends by talking or watching a movie." (Tr. 26). This summary of Plaintiff's activities also reflects the ALJ's earlier summary of Plaintiff's February 2013 function report, *see* Tr. 19 (citing Tr. 224-31), and hearing testimony, *see* Tr. 19-20 (citing Tr. 35-78).

Although Plaintiff is correct that one could view his self-described daily activities and reach a different conclusion about his capabilities, the ALJ's summary is neither incorrect nor

unreasonable. The ALJ did not mischaracterize Plaintiff's daily activities, and his consideration thereof in his analysis and formulating an RFC was reasonable.

*Dr. Holmes's Opinion*

Plaintiff contends it was error for the ALJ to rely in part upon Dr. Holmes's opinion when that opinion was internally inconsistent and not based on substantial evidence. The Commissioner responds that there is no such inconsistency, and there is no error.

The undersigned agrees with the Commissioner that the "inconsistency" in Dr. Holmes's opinion is without consequence. Dr. Holmes provided a single set of functional restrictions in his RFC assessment (including that Plaintiff could stand and/or walk for about four hours in an eight hour workday). (Tr. 87-89). Elsewhere in his summary of the evidence, he described an RFC "for sedentary work (light with significantly limited walking)." (Tr. 85, 87-89). The full range of "light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." SSR 83-10, 1983 WL 31251, at *5. Sedentary work, by contrast, only permits "periods of standing or walking . . . total[ing] no more than about 2 hours of an 8-hour workday[.]" *Id.* Here, Dr. Holmes opined, and the ALJ ultimately found, that Plaintiff could stand or walk for four hours in an eight hour workday (a reduced range of light work). This is not inconsistent with Dr. Holmes's findings. Additionally, although Plaintiff points out that it is indicated a sedentary RFC is being assessed (Tr. 92), the ALJ is not required to adopt all parts of an opinion, even one to which he assigns great weight. *See Majors v. Colvin,* 2014 WL 1238477, *7 (N.D. Ohio) ("[A]n ALJ is not required to adopt every opinion expressed by a nonexamining medical expert, even when an ALJ overall accords that opinion great weight.").

Taking the evidence and the ALJ's opinion as a whole, the undersigned finds the RFC supported by substantial evidence, and no error in the ALJ's analysis. Perhaps most importantly,

the RFC is supported by the opinions of Dr. Saghafi and Dr. Holmes, the only opinion evidence of record. *See Kelly v. Comm'r of Soc. Sec.*, 314 F. App'x 827, 832 (6th Cir. 2009) (noting that the "strongest evidence supporting the ALJ's finding" was the uncontradicted opinion evidence of state agency medical experts). And the ALJ adopted numerous restrictions (including use of a cane and a sit/stand option) to accommodate Plaintiff's physical impairments. It is not this Court's role to reweigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.3d 679. 681 (6th Cir. 1989). Although those restrictions are not as limiting as Plaintiff contends they should be, the undersigned finds the ALJ's RFC supported by substantial evidence and recommends it be affirmed. *See* Jones, 336 F.3d at 477 (court must affirm "so long as substantial evidence also supports the conclusion reached by the ALJ").

### *Cane Restriction*

Plaintiff next contends the ALJ erred in not examining whether a cane was necessary for ambulation, or defining what she meant by using a cane to "balance". Plaintiff also contends that the lifting and carrying requirements of light work are necessarily inconsistent with the use of cane, citing *Love v. Comm'r of Soc. Sec.*, 605 F. Supp. 2d 893, 907 (W.D. Mich. 2009). The Commissioner responds that the use of a cane is not inconsistent with light work. The Commissioner does not appear to dispute that Plaintiff requires a cane to ambulate, but argues the ALJ's use of "balance" necessarily included the need to use a cane while walking.

First, the undersigned finds that although the ALJ could have been more clear (and could have stated Plaintiff required a cane to balance *and* ambulate), the ALJ's decision is supported by substantial evidence. The ALJ's RFC included that Plaintiff "can frequently balance but must be able to use a cane for balance." (Tr. 18). The Selected Characteristics of Occupations defines "balancing" as "[m]aintaining body equilibrium to prevent falling when *walking*, standing,

crouching, or running on narrow, slippery, or erratically moving surfaces[.]" U.S. Dep't of Labor, *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles* 1993, at C-3, *available at* https://www.nosscr.org/sco/sco-ocr.pdf (last visited December 29, 2016); *see also* SSR 96-9p, 1996 WL 374185, at *7 (reciting definition).

In his questioning, the ALJ confirmed the VE was "familiar with Social Security's skills and exertional categories and definitions" and that if the VE gave "an opinion which conflicts with the information in the Dictionary of Occupational Titles that [he] need[ed] to advise us of the conflict and the basis for [his] opinion" (Tr. 71-72). The ALJ also asked the VE to "assume that when I use the terms occasional, frequent or constant that those are the definitions set forth in Social Security's rules, regulations, the [Dictionary of Occupational Titles], and the [Selected Characteristics of Occupations]." (Tr. 73). He also explained that Plaintiff could "frequently balance but due to weakness in the legs also requires the use of a cane for balance." (Tr. 74). With all these restrictions in place, the VE then opined that jobs would be available. (Tr. 74-75). Thus, the VE's testimony provides substantial evidence to support the ALJ's restriction that Plaintiff use a cane for "balance", a term that necessarily included use while walking. *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (a VE's testimony may provide substantial evidence if the hypothetical question accurately conveys a claimant's restrictions).

Second, Plaintiff argues "[i]t is illogical to find that [Plaintiff] cannot balance without the use of a cane, but nonetheless can spend 2/3 of his workday carrying items." (Doc. 14, at 24). In *Love*, the court found it illogical that a person could both carry twenty pounds while requiring the use of a cane. 605 F. Supp. 2d at 907. The Commissioner notes that Plaintiff "points to no authority indicating that use of a cane is *per se* incompatible with light work" and "[i]n fact, this

Court, and others within the Sixth Circuit have consistently upheld RFCs with restrictions of cane usage and light exertional demands[.]" (Doc. 18, at 14).

Unlike was the case in *Love,* here, the ALJ relied upon opinion evidence which supported the conclusion that Plaintiff could perform a reduced range of light work despite his need to use a cane. *See* Tr. 424-25 (Dr. Saghafi's opinion that Plaintiff: 1) could lift up to twenty pounds occasionally, and ten pounds continuously, 2) carry up to twenty pounds occasionally, and 3) required the use of a cane to ambulate); Tr. 88 (Dr. Holmes's findings that Plaintiff: 1) could occasionally lift or carry twenty pounds; 2) frequently lift or carry ten pounds; and 3) "uses cane"). *See Cotton v. Comm'r of Soc. Sec.*, 2016 WL 80667, *4 (W.D. Mich) (distinguishing *Love* in part because the ALJ cited to opinion evidence indicating the plaintiff could perform the lifting and carrying requirements of light work and required a cane to ambulate). Moreover, as the Commissioner points out, this Court and others have consistently upheld RFCs containing the lifting and carrying restrictions of light work and the need to use a cane. *See, e.g., Holley v. Comm'r of Soc. Sec.*, 2015 WL 3620005, *4-6 (N.D. Ohio); *Profitt v. Comm'r of Soc. Sec.*, 2010 WL 3703214, *3 (S.D. Ohio); *Grillot v. Astrue*, 2009 WL 87577, *7-8 (S.D. Ohio).

Moreover, an ALJ may rely on a VE's testimony to provide substantial evidence that a claimant is not disabled. *See Smith v. Halter*, 307 F.3d 377, 378 (6th Cir. 2001). At the final step of the disability analysis, the ALJ must decide whether, in light of the claimant's RFC, age, education, and past work experience, the claimant can make an adjustment to other work. 20 C.F.R. § 404.1520(a)(4). The burden shifts to the Commissioner to prove the existence of a significant number of jobs in the national economy that a person with the claimant's limitations could perform. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999). To meet this burden, there must be a finding supported by substantial evidence that the claimant has the

vocational qualifications to perform specific jobs. *Workman v. Comm'r of Soc. Sec.*, 105 F. App'x 794, 799 (6th Cir. 2004). The VE's testimony may provide substantial evidence. *Smith*, 307 F.3d at 378.

Here, in his questioning to the VE, the ALJ confirmed that the VE would advise of any conflict between the Dictionary of Occupational Titles and his testimony. (Tr. 72). The ALJ then described a hypothetical individual with both lifting and carrying restrictions consistent with light work and the need to use a cane for balance. (Tr. 73-74). Given the hypothetical, the VE identified three potential jobs, totaling 3,500 jobs in the state of Ohio. *See* Tr. 75 (identifying 7,000 jobs, and then stating the number would be reduced by 50 percent when a restriction to "perform work at a seated or standing position" was added). Substantial evidence may be produced through reliance on the testimony of a VE in response to a hypothetical question, where the question accurately portrays the claimant's impairments. *Id*. Significantly here, the VE had both restrictions before him (in addition to the requirement that Plaintiff be able to perform any job sitting or standing, *see* Tr. 74-75), and opined that the listed jobs would be available. The VE's testimony therefore provides substantial evidence for the ALJ's conclusion that Plaintiff was capable of performing jobs in the national economy and there was no error here. *See Smith*, 307 F.3d at 378; *Branon v. Comm'r of Soc. Sec*., 539 F. App'x 675, 680 (6th Cir. 2013) ("So long as the hypothetical is accurate, the administrative law judge may rely on the vocational expert's testimony to find that the plaintiff can perform a significant number of jobs in the national economy.").

## CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the undersigned recommends the Court find the decision denying DIB and SSI supported by substantial evidence and affirm the Commissioner's decision.


 s/James R. Knepp II
United States Magistrate Judge


ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).