UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Mathew J. Bonette,                             Case No. 3:16-cv-252

          Plaintiff

   v.                                              MEMORANDUM OPINION

Commissioner of Social Security[1],

          Defendant

This matter is before me on Plaintiff's objections (Doc. No. 20) to the February 2, 2017 Report and Recommendation of the Magistrate Judge. (Doc. No. 19). Also before me is the Defendant's response to Plaintiff's objections. (Doc. No. 21).

As there were no objections to the procedural and factual background of the Report, I will adopt it in its entirety:

**PROCEDURAL BACKGROUND**

Plaintiff filed for DIB and SSI in January 2013, alleging a disability onset date of May 9, 2012. (Tr. 161-74). The Commissioner, through the state agency, denied his applications at the initial level of review. (Tr. 79-108). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). *See* Tr. 121. Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on June 19, 2014. (Tr. 35-78). On September 29, 2014, the ALJ found Plaintiff not disabled in a written decision. (Tr. 13-29). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-6); 20 C.F.R. §§ 404.955, 404.981. Plaintiff filed the instant action on February 2, 2016. (Doc. 1).

**FACTUAL BACKGROUND**

*Personal Background and Testimony*

---

[1] As noted by the Defendant in their Response brief, Nancy A. Berryhill is now the Acting Commissioner of Social Security.

Plaintiff was 50 years old at the time of the ALJ hearing and had a high school education and some college classes. (Tr. 44-45, 46). He had a driver's license, and drives short distances, but a friend had driven him to the hearing. (Tr. 44-45, 59). He did not have a handicapped permit for his car. (Tr. 59). The drive to the hearing was about an hour and his lower back "got quite sore". (Tr. 45).

Plaintiff lived alone. (Tr. 44). Volunteers of America paid, a friend covered his utilities, and he had medical coverage through the VA. (Tr. 45-46). He relied on food stamps, which he had been receiving since February 2014. (Tr. 46).

Plaintiff had previously worked as a paramedic, delivery driver, warehouse worker, and performed physicals on prospective plasma donors. (Tr. 47). As a delivery driver, he was on the road twelve hours per day five to six days per week. (Tr. 49). When he performed physicals, "[i]t was a lot of up and down work". (Tr. 50). During late 2011 or early 2012, the "getting up and down and walking to the donor floor got to be difficult." (Tr. 50-51). This was because he had "a lot of pain in the feet and legs" with "pins and needles, burning sometimes." (Tr. 51). Then in May 2012, Plaintiff began having an "increase in near falls and falls" and an increase in pain in his legs and lower back. (Tr. 52). His physician advised him to stop working. *Id.*

Plaintiff then began working again in September 2013 for a company that helps keep developmentally disabled people living independently. (Tr. 53). He worked a desk job remotely monitoring people in their individual homes. (Tr. 53-54). Before November he was in training, but in November 2013 he began working 32 hours per week. (Tr. 55). He experienced a lot of anxiety working that job. *Id.*

Plaintiff testified the biggest issue preventing him from working is the pain in his legs and back. (Tr. 56). Plaintiff estimated he could sit for fifteen to twenty minutes comfortably before getting pain in his lower back that would travel to his hips. *Id.* Getting up and stretching helped for a few minutes. *Id.* Similarly, he estimated he could stand for ten to fifteen minutes at a time, and walk for about ten minutes. *Id.*

Plaintiff does his own grocery shopping, but makes short (less than fifteen minute) trips. (Tr. 57). He does household chores, but breaks them up into increments, sitting down to rest at times. (Tr. 58). He usually has to take a ten to fifteen minute break (sitting with his legs elevated) after ten to fifteen minutes of work. (Tr. 64-65). This is because his lower body (legs, back, and feet) get sore and his ankles swell. *Id.* He sits down to elevate his legs above waist level four to five times per day for 15 to 25 minutes at a time. (Tr. 65). It helps "some" with the pain and burning sensation he gets in his feet. (Tr. 65-66).

He is generally able to take care of personal grooming. (Tr. 60). He takes short showers, and has to sit down to get dressed so he does not fall. *Id.* He used to hike, hunt and fish, camp, make jewelry, and do wood carving. (Tr. 58). The only activity he can still do is the jewelry making, but "it's limited to how long I can actually work on a piece." *Id.*

Plaintiff does not sleep well at night, waking four to six times per night due to pain and disturbing dreams. (Tr. 68). He will "roll over, reposition, try to stretch out the area that's sore, and then try to get back to sleep." *Id.* He also naps every afternoon. *Id.*

Plaintiff uses a cane because he "had a number of near falls" and his right side is his weaker side. (Tr. 59). He uses the cane for support to take weight off his right leg. (Tr. 59-60). He testified that squatting aggravates his pain, kneeling is "next to impossible", and "[b]ending down to pick something up is pretty difficult". (Tr. 60).

Plaintiff estimated he can comfortably lift between ten and twenty pounds but "anything over 20 gets quite painful" in his knees and lower back. (Tr. 61). He has difficulty reaching for things over his head and drops things often because he "can't feel them in [his] hands." *Id.*

Plaintiff testified that during his 2012 treatment at the Sparrow Pain Center he had steroidal injections, which helped for a week to two weeks. (Tr. 67). The injection did not eliminate the

pain, "but it would ease it enough so that [he] could function a little better." *Id.* He also had an ablation on the right side which only lasted a day or two. *Id.*

At the time of the hearing, Plaintiff was taking "Neurontin which is Gabapen," Effexor, Mobic, Prazosin, and aspirin. (Tr. 63).

*Relevant Medical Evidence*[2]

*Prior to Alleged Onset Date*

Beginning in January 2011, Plaintiff saw Shannon Wiggins, D.O., complaining of "chronic lower back pain and decreased mobility." (Tr. 378). Dr. Wiggins diagnosed disc disorder (not otherwise specified) and radiculitis (not otherwise specified). (Tr. 379). In early 2011, Dr. Wiggins also diagnosed joint pain (unspecified) (Tr. 372, 374), lumbago (Tr. 372, 374, 377), muscle spasms (Tr. 374), and arthralgia (Tr. 374).

In March 2011, Plaintiff saw neurologist Jayne Ward, D.O., for "paresthesias, gait difficulties and possible MS." (Tr. 322). She noted these problems had begun March 2010, and that Plaintiff started using a cane in December 2010. *Id.* Dr. Ward noted a decreased Achilles reflex bilaterally, 5/5 strength proximally and distally in all 4 limbs, no atrophy or fasciculations, and an antalgic gate with cane. (Tr. 324). Dr. Ward's impression was paresthesias "with some suggestion of peripheral neuropathy on exam", fatigue, and diffuse pain. (Tr. 325).

In April 2011, Plaintiff underwent a cervical spine MRI and brain MRI. (Tr. 253, 255). The cervical spine MRI showed "left-sided disc extrusion perhaps in conjunction with spurring at the C2-C3 level causing asymmetric narrowing of the left foramen and lateral recess but no frank cord compression" and "spondylotic changes demonstrated throughout the cervical spine with associated facet arthropathy causing narrowing of foramina at multiple levels." (Tr. 254). The brain MRI showed an "atypical area of periventricular signal involving the right lateral ventricle anteriorly." (Tr. 255).

In June 2011, Plaintiff underwent an electrodiagnostic evaluation with M. Andary, M.D. (Tr. 257). Dr. Andary noted Plaintiff complained of "progressively worsening paresthesias in the fingertips and in the toes", "generalized achy pain as well as weakness in the legs" and "progressively worsening unsteady gait." *Id.* Dr. Andary noted motor strength of "4+ to 5/5" with "giveway weakness". *Id.* He noted muscle stretch reflexes were absent in the bilateral patellar tendons, and bilateral calf tenderness to palpation. *Id.* Dr. Andary also noted no muscle atrophy and negative bilateral straight leg raising. *Id.* Dr. Andary noted Plaintiff's symptoms were "difficult to pull together under one diagnosis" but were most consistent with "a non length dependent, primarily axonal, primarily motor, polyradiculoneuropathy." (Tr. 258).

Plaintiff saw Dr. Ward again in the second half of 2011 and reported numbness in his hands and feet as well as joint and muscle pain. (Tr. 317-20, 312-15). Dr. Ward noted decreased strength of 4/5 in leg muscles, but no atrophy or fasciculations, and physiologic tone in upper and lower extremities. (Tr. 319). She also noted unsteady heel, toe, and tandem walking. (Tr. 314, 319). Dr. Ward also observed a decreased Achilles reflex bilaterally and decreased sensation in a distal to proximal pattern to pin prick, temperature, and vibration. *Id.* Dr. Ward's impression remained neuropathy, fatigue and diffuse pain. (Tr. 315, 319).

---

[2]. Plaintiff only challenges the ALJ's decision as it relates to his physical impairments, specifically his neuropathy. As such, the undersigned only summarizes the relevant evidence in the transcript. *See Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003) (issues not raised in claimant's brief waived).

3

Plaintiff also continued to see Dr. Wiggins, who diagnosed neuropathy and prescribed medication. (Tr. 360-64).

Plaintiff had a repeat electrodiagnostic evaluation with Dr. Andary in December 2011. He noted Plaintiff reported more fatigue, but his weakness and function were about the same, and he had stopped walking with a cane. (Tr. 302). He again noted mild giveway weakness in the quadriceps, anterior tibiols and extension hallucis longus. *Id.* Dr. Andary again noted "diffuse electrodiagnostic abnormalities that appear to be most consistent with a non length dependent, primarily axonal, primarily motor polyradiculoneuropathy." *Id.* He noted that "[i]it is possible it is slowly improving" but that he was "not able to absolutely prove that." *Id.*

Plaintiff again saw Dr. Ward in January 2012. (Tr. 307). He reported worsening gait, a burning sensation in his hands, and leg weakness after standing or sitting too long. *Id.* Dr. Ward noted similar physical findings as in previous visits, and continued to assess neuropathy, fatigue, and diffuse pain. (Tr. 309-10).

Plaintiff underwent a neuromuscular evaluation in January 2012 with Richard Lewis, M.D. (Tr. 327-29). Plaintiff reported a waddling gait for the past two to three years, tingling in his hands, numbness in his feet, as well as joint and muscle pains. (Tr. 327). A physical examination revealed no tenderness in his joints, absent reflexes in his legs, "markedly absent vibration in the toes, decreased at the ankles", decreased pin sensation at his ankles, and a tentative gait that was "slightly wide-based." (Tr. 328). Dr. Lewis concluded Plaintiff "does not have evidence of neuropathy. . . . The EMG findings of diffuse limb and paraspinal fibrillations are difficult to interpret but the studies do not clearly suggest an axonal neuropathy. Given the family history this may well represent an inherited disorder but it may not be a neuropathy." *Id.*

*After the Alleged Onset Date*

Plaintiff continued to treat with Dr. Wiggins in 2012. She noted decreased sensation in Plaintiff's feet (Tr. 356, 358), complaints of burning pain (Tr. 354, 355, 358), and numbness (Tr. 356). In May, Dr. Wiggins noted it was difficult for Plaintiff to work as he could not stand for long hours and that she would "give him off work for one month pending referral to pain [service]." (Tr. 358). In June, she noted "[N]eurontin is working well overall" but that Plaintiff was unable to see pain service right away so she would "extend his loa [leave of absence] for another 30 days." *Id.* He returned in July after having seen pain services. (Tr. 355). Dr. Wiggins noted Plaintiff had "severe peripheral neuropathy, etiology unknown" with "chronic lower limb pain, burning, and numbness", but that she would refill his medications as Plaintiff stated they "assist him with the activities of daily life." *Id.* She repeated that "the medications help him with the activities of daily life" in September 2012. (Tr. 354).

In June 2012, Plaintiff underwent a consultation with Marc Silverstein, M.D., at Sparrow Pain Management Center. (Tr. 342-43). Plaintiff reported progressively worsening pain and a diagnosis of idiopathic neuropathy. (Tr. 342). He described constant pain in his lower back, upper extremities, and lower extremities that increased with activity, and decreased with rest, not working, cold, [and] medications." *Id.* On examination, Dr. Silverstein found: 1) increased pain in the lumbar spine with hyperextension, flexion, and rotation; 2) tenderness to palpation in the thoracolumbar spine axially and bilaterally; 3) reduced deep tendon reflexes and sensation of the bilateral upper and lower extremities; 4) generalized weakness and deconditioning in the bilateral upper and lower extremities; 5) altered gait due to use of a cane; and 6) negative straight leg raises and Spurling sign. (Tr. 343). Dr. Silverstein assessed cervicalgia, low back pain, disc degeneration, radiculopathy, spondylosis, and neuropathy. *Id.* He scheduled Plaintiff for joint injections. *Id.*

Plaintiff underwent lumbar injections from June 2012 through September 2012. (Tr. 330-41). Before the first injections (bilateral lumbar facet joint injections from L3-4 to L5-S1), Plaintiff described pain of 8/10 and had tenderness to palpation in his axial low back and pain with facet loading bilaterally. (Tr. 340). The following month, Plaintiff described pain in the lower back with radiation into both buttocks with pain 7-8/10. (Tr. 338). Plaintiff underwent lumbar transforaminal epidural steroid injections at L4-5 and L5-S1. *Id.* In August 2012, Plaintiff reported nerve block therapy "so far has not given him significant relief." (Tr. 336). He underwent bilateral sacral transforaminal epidural steroid injections at S1, S2, and S3. *Id.* Later that month, Plaintiff reported the bilateral lumbar facet joint injections had provided 70% to 80% "of good pain relief for 2-3 days" but other interventions had not provided benefit. (Tr. 334). He underwent an interlaminar lumbar epidural steroid injection. (Tr. 334-35). At his next visit in September 2012, Plaintiff reported he had significant relief of his pain for three to four days following the dorsal sacral nerve block. (Tr. 332). Examination indicated similar findings to those in June 2012, but gait was "steady and symmetrical." *Id.* Later in September 2012, the pain management physician reported Plaintiff had eight to ten days of "dramatic improvement when peripheral nerve blocks were carried out in" August of that year. (Tr. 330). Plaintiff then underwent a right-sided peripheral nerve neurolysis because of "his failure to respond to conservative management". (Tr. 330-31). There are no additional records from Sparrow Pain Management.

In October 2012, Plaintiff saw James Eichmeier, M.D., in the same office as Dr. Wiggins. (Tr. 353). He noted "idiopathic polyneuropathy" and nerve conduction studies scheduled for the following day. *Id.* Dr. Eichmeier noted that "if that verifies chronic diffuse polyneuropathy", Dr. Eichmeier would "fill out his papers." *Id.* The nerve conduction study was performed the following day. (Tr. 345-50). The results were normal with "no electrophysiologic evidence for either a mono or peripheral polyneuropathy". (Tr. 347).

In November 2012, Plaintiff saw a provider at Dr. Wiggins's office.[3] The treatment note references Plaintiff's nerve conduction study, but notes it "is not on the chart yet." (Tr. 352). Plaintiff brought "papers for permanent disability", but the provider "told him [he or she] did not known him well and not well. [sic] Objective data and [the provider] suggested he return to see Dr. Wiggins at which time hopefully we will be able to[] get [his] nerve conduction study on the computer" but that at the present time, the provider could not "totally disable him." *Id.*

In January 2013, Plaintiff reported a worsening of his polyneuropathy to Dr. Wiggins. (Tr. 351). Dr. Wiggins reported decreased sensation in bilateral feet, right greater than left, and that Plaintiff walked with a cane. *Id.* She noted completing "friend of the court papers for disability" and "an exam form for dhs." *Id.*

In January 2014, Plaintiff underwent another nerve conduction study of his legs and feet with Kalyani Shah, M.D. (Tr. 397-400). It showed a moderate degree of peripheral sensory polyneuropathy in the lower extremities, which was demyelinating in nature. (Tr. 400). It showed no evidence of peroneal entrapment neuropathy at fibular head bilaterally and no evidence of bilateral lumbar radiculopathy. *Id.*

*Opinion Evidence*

In April 2013, state agency reviewing physician Russell Holmes, M.D., opined that Plaintiff could: 1) occasionally lift and/or carry 20 pounds; 2) frequently lift and/or carry 10

---

[3]. This treatment note indicates Dr. Wiggins as the provider, and bears her electronic signature, but the text of the note indicates it was written by a different provider. *See* Tr. 352 (noting Plaintiff should "return to see Dr. Wiggins" and stating that medications were reviewed by Dr. Eichmeier).

5

pounds; 3) stand and/or walk for four hours in an eight-hour workday; 4) sit about six hours in an eight-hour workday; 5) limited push/pull in lower extremities—frequent bilateral foot pedal; 6) frequently climb ramps and stairs, balance, kneel, or crawl; 7) occasionally climb ladders, ropes and scaffolds; and 8) occasionally stoop, or crouch. (Tr. 88). He also believed Plaintiff should avoid concentrated exposure to extreme cold or heat, vibration, fumes, odors, dust, gasses, and hazards. (Tr. 88-89). In response to a question regarding the "seven strength factors of the physical RFC (lifting/carrying, standing, walking, sitting, pushing, and pulling), the individual demonstrates the maximum sustained work capacity for the following", the agency answered "SEDENTARY." (Tr. 92). Earlier, in the "findings of fact and analysis of evidence" section, the agency physician noted: "RFC for sedentary work (light with significantly limited walking). Clmt uses cane to ambulate. Gait changes, noted to be unsteady." (Tr. 85).

After the ALJ hearing, in July 2014, Plaintiff underwent a consultative examination with neurologist Dariush Saghafi, M.D. (Tr. 421-23). Plaintiff reported to Dr. Saghafi that his pain was localized in his lower back, and had gotten worse over the past six years. (Tr. 421). He reported that getting off his feet improves the pain, while bending and reaching makes it worse. *Id.* He reported medication "doesn't really help" and that lifting ten pounds is "quite painful." *Id.* On examination Dr. Saghafi found a 70 to 80% reduction in tactile sensation below mid-calf, worse on the left side. (Tr. 423). He noted an "antalgic gait without predisposition to falls." *Id.* Dr. Saghafi observed Plaintiff's "[t]one and bulk are normal for age and build in both upper and lower extremities" with "no signs of focal atrophy, fasciculations, or myotonia" and "no orbiting or pronator drift." (Tr. 422). He found full motor strength in both upper and lower extremities. *Id.*; *see also* Tr. 431. Dr. Saghafi's impression was that Plaintiff "demonstrate[s] elements of a sensory neuropathy in the lower extremities." (Tr. 423). He noted Plaintiff "is able to lift, push, and pull sufficiently to be able to perform some ADL's but is restricted to 10 lbs of lifting. The patient is able to bend, walk, and stand x 15-20 min." *Id.*

The same day, Dr. Saghafi completed a physical capacity evaluation form. (Tr. 424-29). He indicated Plaintiff could continuously lift up to 10 pounds, occasionally lift up 11 to 20 pounds, and occasionally carry 11 to 20 pounds. (Tr. 424). He opined Plaintiff could: 1) sit, stand, or walk for fifteen minutes at a time without interruption; 2) sit for four hours total in an eight-hour workday; 3) stand or walk for two hours total each in an eight-hour workday. (Tr. 425). He stated Plaintiff needed a cane to ambulate, but could walk 100 yards without the use of the cane. *Id.* He indicated that Plaintiff could use his free hand to carry small objects with the cane. *Id.*[4] He found Plaintiff had no restrictions in the use of his hands and could frequently operate foot controls with both feet. (Tr. 426). Plaintiff could never climb ladders or scaffolds, but could frequently climb stairs and ramps, balance, stoop, kneel, crouch, or crawl. (Tr. 427). He also found Plaintiff should never be exposed to unprotected heights or very loud noises. (Tr. 428). He opined that the restrictions above were first present "4-5 years ago" and that the limitations have lasted (or will last) for twelve consecutive months. (Tr. 429).

***VE Testimony and ALJ Decision***

*VE Testimony*

---

[4]. The form question states: "Without a cane, can the individual use his/her free hand to carry small objects?" (Tr. 425). This appears to be a typographical error, and should read "with" rather than "without" a cane (otherwise the individual would not have only one "free hand"). This understanding appears to be confirmed by the notation Dr. Saghafi made at the bottom of the page: "[c]ane is used for carrying small objects at a time." *Id.*

> For the first hypothetical, the ALJ asked the VE to assume:
> An individual who can lift 20 pounds occasionally, 10 pounds frequently; who can stand and walk for a total of four hours in a day; and sit for six hours in the day. The individual can frequently push and pull with bilateral lower extremities; can frequently climb stairs and ramps; occasionally climb ladders, ropes, and scaffolds; can frequently balance but due to weakness in the legs also requires the use of a cane for balance.
>
> The individual can frequently stoop; occasionally kneel; frequently crouch; and there's no restriction on crawling. The individual must avoid concentrated exposure to extreme temperatures; avoid concentrated exposure to respiratory irritants; and avoid concentrated exposure to vibration and to hazards such as dangerous moving machinery and unprotected heights.

(Tr. 73-74). The VE testified that such an individual could perform jobs including assembler, package, and inspector. (Tr. 74).

The ALJ then added a restriction that "the individual . . . should be allowed to perform work at a seated or standing position." (Tr. 75). The VE testified that the same jobs would be available, but reduced by 50 percent. (Tr. 76).

When a restriction was added that the individual could work for 10 to 15 minutes and then take a break for 10 to 15 minutes, the VE testified that it would eliminate all competitive employment. (Tr. 76). The same was true when a restriction requiring elevating the legs four to five times per day for 10 to 25 minutes. *Id*. Finally, the VE testified that the normal tolerance for absenteeism is one day per month. *Id.*

### *ALJ Decision*

After reviewing the record, the ALJ concluded Plaintiff: 1) met the insured status requirements of the Social Security Act through March 31, 2018; 2) had not engaged in substantial gainful activity since May 9, 2012 (his alleged onset date); 3) had severe impairments of degenerative disc disease of the lumbar spine, moderate bilateral idiopathic progressive neuropathy, major depressive disorder (in partial remission), and alcohol use disorder (in early remission); 4) and did not have an impairment or combination of impairments that meets or equals the severity of the listings. (Tr. 16-17). The ALJ then concluded Plaintiff retained the residual functional capacity to:

> [p]erform less than the full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b) in that he can lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk for 4 hours and sit for 6 hours out of an 8-hour workday. He can occasionally climb ladders, ropes, and scaffolds and frequently climb stairs and ramps and frequently use his bilateral lower extremities for pushing and pulling. He can frequently balance but must be able to use a cane for balance and requires the ability to alternate between sitting and standing. He can occasionally kneel and frequently crouch and stoop. He does not have any limitations relative to the ability to crawl. He must avoid concentrated exposures to temperature extremes, respiratory irritants, vibrations, and hazards such as unprotected heights and moving machinery. He is limited to work consistent with a SVP of two, which means work that can be learned within the timeframe of a short demonstration up to 30 days.

7

(Tr. 18). The ALJ noted Plaintiff was 48 years old, a younger individual, on the alleged disability onset date, and subsequently changed age category to closely approaching advanced age. (Tr. 28). She noted Plaintiff had at least a high school education, and concluded (relying on the testimony of the VE) considering Plaintiff's age, education, work experience, and RFC, there were jobs that exist in significant numbers in the national economy that Plaintiff can perform. (Tr. 28). Therefore, the ALJ found Plaintiff was not disabled from May 9, 2012 through the date of her decision. (Tr. 29).

(Doc. No. 19 at pp. 1-13).

## STANDARD OF REVIEW

A district court must conduct a *de novo* review of "any part of the magistrate judge's disposition that has been properly objected to. The district judge may accept, reject or modify the recommended disposition, receive further evidence, or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3); *see also Norman v. Astrue*, 694 F.Supp.2d 738, 740 (N.D. Ohio 2010).

The district judge "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997); *see also* 42 U.S.C. § 405(g). "Substantial evidence is defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007) (*quoting Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001)). If the Commissioner's findings of fact are supported by substantial evidence, those findings are conclusive. *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006).

8

**PLAINTIFF'S OBJECTION**

Plaintiff lodges a sole objection to the R & R, specifically aimed at his use of a cane. He argues the ALJ erred in not examining whether a cane was necessary for ambulation or failed to define what was meant by using a cane for balance.

In his R & R, the Magistrate Judge noted the ALJ's analysis could have clarified the Plaintiff's necessity of a cane for both balance and ambulation. Nevertheless, the Magistrate Judge found the ALJ's decision was supported by substantial evidence relying on The Selected Characteristics of Occupations (SCO) Defined in the Revised Dictionary of Occupational Titles as well as SSR 96-9p, 1996 WL 374185. The R & R then discussed the ALJ's questioning of the VE and his familiarity with the skills and exertional categories and definitions before asking for an opinion which took into account the Plaintiff's "balance but due to weakness in the legs also require[d] the use of a cane for balance." (Doc. No.19 at p. 25, citing Tr. 74).

The Magistrate Judge also addressed Plaintiff's complaint at the finding that a person could use a cane yet be able to meet the light work requirement of carrying items for up to two-thirds of a workday. (*Id.* at pp. 25-26).

In his objection, the Plaintiff charges the ALJ erred in limiting cane usage to the specific act of balancing, to the exclusion of all other tests and contrary to the SCO definition of balancing. I disagree.

In making this determination, I have examined the relevant sections of the SCO and the relevant Social Security Ruling (SSR) which apply in this case.

The SCO, specifically at Appendix C, describes the physical demands component as follows:

> Physical Demand components, as used within the U.S. Employment Service (USES) Occupational Analysis Program, provide a systematic way of describing the physical activities that an occupation requires of a worker.
>
> Within USES, the assessment of physical demands

- is focused primarily on the physical demands of the job—not the physical capacities of the worker;

9

- provides the means to combine information about many jobs into composite occupational information;
- permits the matching of workers and jobs based upon the workers' capabilities;
- permits the modification of the physical demands of a job to fit the capabilities of disabled workers.

**PHYSICAL DEMAND FACTORS AND DEFINITIONS**

The Physical Demands of an occupation are described in relationship to twenty different factors. . . .

### 3. BALANCING

Maintaining body equilibrium to prevent falling when walking, standing, crouching, or running on narrow, slippery, or erratically moving surfaces; or maintaining body equilibrium when performing gymnastic feats.

SOC at C-1 and C-3.

Social Security Ruling 96-9p addresses the guidelines for evaluating the ability

to do less than a full range of sedentary work.

The following sections provide adjudicative guidance as to the impact of various RFC limitations and restrictions on the unskilled sedentary occupational base. The RFC assessment must include a narrative that shows the presence and degree of any specific limitations and restrictions, as well as an explanation of how the evidence in file was considered in the assessment. The individual's maximum remaining capacities to perform sustained work on a regular basis and continuing basis (what he or she can still do 8 hours a day, for 5 days a week, or an equivalent work schedule) must be stated.

An accurate accounting of an individual's abilities, limitations, and restrictions is necessary to determine the extent of erosion of the occupational base, the types of sedentary occupations an individual might still be able to do, and whether it will be necessary to make use of a vocational resource. The RFC assessment must be sufficiently complete to allow an adjudicator to make an informed judgment regarding these issues.

**Medically required hand-held assistive device:** To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed ( i.e., whether all the time, periodically, or only in certain situation; distance and terrain; and any other relevant information). The adjudicator must always consider the particular facts of a case. For example, if a medically required hand-held assistive device is needed only for prolonged ambulation, walking on uneven terrain, or ascending or descending slopes, the unskilled sedentary occupational base will not ordinarily be significantly eroded.

> Since most unskilled sedentary work requires only occasional lifting and carrying of light objects such as ledges and files and a maximum lifting capacity for only 10 pounds, an individual who uses a medically required hand-held assistive device in one hand may still have the ability to perform the minimal lifting and carrying requirements of many sedentary unskilled occupations with the other hand. For example, an individual who must use a hand-held assistive device to aid in walking or standing because of an impairment that affects one lower extremity (e.g., an unstable knee), or to reduce pain when walking, who is limited to sedentary work because of the impairment affecting the lower extremity, and who has no other functional limitations or restrictions may still have the ability to make an adjustment to sedentary work that exists in significant numbers. On the other hand, the occupational base for an individual who must use such a device for balance because of significant involvement of both lower extremities (e.g., because of a neurological impairment) may be significantly eroded.
>
> In these situations, too, it may be especially useful to consult a vocational resource in order to make a judgment regarding the individual's ability to make an adjustment to other work.

SSR 96-9p, 1996 WL 374185 at *4 and *7.

> Based upon these guides, the ALJ posed the following hypothetical question to the VE:
>
> Q: So, Mr. Fuller, please assume that when I use the terms occasional, frequent or constant that those are the definitions set forth in Social Security's rules, regulations, the DOT, and the SCO. In the first hypothetical, we have an individual who can lift 20 pounds occasionally; 10 pounds frequently; who can stand and walk for a total of four hours in a day; and sit for six hours in the day. The individual can frequently push and pull with bilateral lower extremities; can frequently climb stairs and ramps; occasionally climb ladders, ropes, and scaffolds; can frequently balance but due to weakness in the legs also require the use of a cane for balance.
> The individual can frequently stoop; occasionally kneel; frequently crouch; and there's no restriction on crawling. The individual must avoid concentrated exposure to extreme temperatures; avoid concentrated exposure to respiratory irritants; and avoid concentrated exposure to vibration and to hazards such as dangerous moving machinery and unprotected heights.
> So, given that vocational profile, would an individual be able to perform any of the Claimant's past work as you've identified it?

(Doc. No. 12 at pp. 77-78).

Although the ALJ did not make a specific finding of whether the Plaintiff required a cane for ambulation, the hypothetical question posed to the VE outlined the relevant abilities and restrictions. Those abilities included walking and standing. The SCO cautions in considering the particular facts of every case as well as giving examples of when the unskilled sedentary occupational base will or will not ordinarily be significantly eroded. Consultation with a vocational resource is

11

also suggested. The Plaintiff also testified he needed the cane for balance after a number of "near falls," specifically supporting the right leg. (*Id.* at pp. 63-64).

Having considered the applicable guides and the testimony adduced at the hearing, I agree with the Magistrate Judge that the ALJ's decision is supported by substantial evidence. Accordingly, the Plaintiff's objection is overruled.

## CONCLUSION

For the reasons stated above, the Court adopts the February 2, 2017 Report and Recommendation (Doc. No. 19) as the Order of this Court. The Commissioner's decision is affirmed.

So Ordered.

                                                  s/ Jeffrey J. Helmick
                                                  United States District Judge